HERGET, Judge.
Plaintiff, Rose Mae Derozin, accompanied by members of her family drove to the Illinois Central Railroad depot on May 19, 1959 for the purpose of placing her aunt, Charlene Jack, on the train. The station is located on the west side of South Front Street in the City of Baton Rouge, Louisiana. The Plaintiff, her mother Laura Albert and her aunt Charlene Jack emerged from the automobile parked on the eastern curb of Front Street at about 11:30 p. m. for the purpose of entering the railroad station. In crossing Front Street from the east to the west Plaintiff preceded the others and had nearly reached the western curb of Front Street; her aunt, Charlene Jack, was close behind her, and her mother was in the center of the street when an automobile operated by Charles J. Lyons, Jr., an assured of defendant, Zurich Insurance Company, made a left turn into Front Street from North Boulevard which forms a “T” with Front Street intersection on the eastern side thereof, struck Plaintiff’s mother, killing her.
In her petition Plaintiff alleged she did not know whether or not the vehicle struck her but that subsequent to the accident she was on the east side of Front Street against an iron fence surrounding the old State Capitol building; that she was seven months pregnant at the time of the accident; that she was physically injured as a result of the accident, which injuries caused the stillbirth of her child on July 7, 1959. She prays for damages for physical and mental pain and suffering for herself and for physical and mental pain and suffering to her unborn child prior to its death.
In its answer Defendant admitted that its assured was in an accident on May 19, 1959 at the time and place described in Plaintiff’s petition, but denied expressly that the Plaintiff was in any way involved in said accident except as a witness. Defendant further admitted that Plaintiff’s pregnancy resulted in the stillbirth of her child but denied that the death of her child or her own injuries were caused by the accident.
The Trial Court, for oral reasons assigned dictated in the record, rendered judgment in favor of Defendant and against Plaintiff dismissing her demands, from which judgment Plaintiff brings this appeal.
There is no evidence whatever in the record that the car operated by Defendant’s assured struck Plaintiff. To the contrary, from the testimony of Charlene Jack, Plaintiff’s aunt, whom she called as a witness, it is obvious that the vehicle insured by Defendant did not in any way come in contact with Plaintiff. She testified that she was following Plaintiff across the street; that she was not struck by the assured’s vehicle because she threw herself away from the car, landing on the western curb of Front Street, therefore as Plaintiff was in front of her it would have been impossible for Plaintiff, who was farther from the path of the vehicle than Charlene, to have been hit.
Plaintiff herself gave a most confusing version of the accident. However, according to her testimony she was on the east side of the street when the vehicle of Defendant’s assured struck her mother as she related “ * * * fixing to cross the road.” *545 If, in fact, she had not begun to cross Front Street when the vehicle struck her mother, certainly the vehicle did not come in contact with her. Immediately following the accident in which her mother was killed she was leaning against the iron fence surrounding the old State Capitol building on the east side of Front Street, and in response to the query as to whether or not the automobile had knocked her over there, she replied: “I don’t know nothing. I really don’t know.” Plaintiff was unable to recall any pertinent fact relating to the facts of this accident which would have established physical injuries to herself and her unborn child or the manner in which same were sustained.
Undoubtedly Plaintiff, a witness to the accident in which the Defendant’s assured ran into and killed her mother, was greatly distressed and shocked as a result of the occurrence. However, Plaintiff brings this suit for physical injuries which she allegedly sustained on the night of the accident which injuries she maintains caused the death of her unborn child. From our examination of the record we fail to find any proof of physical injuries which she might have received in the accident. Though Plaintiff testified that she consulted her attending physician Dr. Frank G. Rieger in reference to the bruises or injuries she allegedly received on the night in question, Dr. Rieger when called as a witness was unable to recall such a visit and after a diligent search was unable to locate a memorandum of such a visit in his records. Dr. Rieger had attended Plaintiff for a number of years prior to the accident, but had first seen her for this fourth pregnancy on May 9, 1959 when he diagnosed her as pregnant and found her to be in normal condition. According to his records he examined her routinely again on June 5, 1959, fifteen days after the accident, when she complained of bruises on her legs and chest. He did not find them to be serious, prescribed no treatment and noted that her condition was still normal. He saw her again as an emergency on July 7, 1959 when she was found to have a massive hemorrhage. From his examination he discovered that the baby was dead and called in Dr. Homer Appleby of Baton Rouge, a specialist in obstetrics and gynecology, to aid him in the surgery and together they performed an emergency hysterectomy. Dr. Rieger related:
“A, The patient had an abruptio placenta and a section hysterectomy was done because of the massive hemorrhage that she had, bleeding into the wall of uterus. This was on 7-7-59 and the baby was born dead. The baby was dead at the time of section.
“Q. Would you say that still birth of her baby and the hemorrhage and other conditions which you have described would be traceable back to this accident ?
“A. You can’t say positively. This could occur without being in an accident. What the relationship of the accident is would be difficult to just specifically prove. However, it certainly is possible that a small separation of the placenta could have occurred at the time of the accident and this, by slow leakage of blood, gradually increased to the point of precipitation that necessitated her surgery, the death of the baby and the subsequent hysterectomy because of the damage caused from hemorrhage, in order to stop the bleeding.”
Dr. Rieger related that Plaintiff had sustained a massive hemorrhage about an hour to an hour and a half prior to her admission to the hospital on the night of the surgery, July 7, 1959, and in the course of his testimony defined the meaning of “abruptio placenta” as follows:
“A. * * * The placental attachment on the wall of the uterus, of course, serves as the supply of food, blood and oxygen to this growing fetus, the baby that’s developing. This placenta is a rather massive thing. It *546 covers a wide area and it very frequently separates in a small — an edge of it will separate in a lot of cases and they go on to a normal, and have a normal pregnancy and have a normal baby. * * * It’s much more common in women that have had multiple pregnancies. Apparently, the vitality of the uterine wall has been diminished, due to some vascular change, and they just can’t maintain this placental attachment, and they subsequently separate and hemorrhage.
“Q. With no other precipitating factor present?
“A. With no other factor present.”
He further expressed the opinion that if Plaintiff had had massive bleeding at the time of the accident he would be satisfied, even though she had the potential, that the accident would have definitely been the causation of the abruptio placenta, but inasmuch as there was no massive bleeding at the time of the accident and because of the length of time involved between the date of the accident and the date of the occurrence of the abruptio placenta he was unable to say that the accident caused the abruptio placenta.
It appears from Dr. Rieger’s testimony that if Plaintiff had in fact suffered injuries on the night of May 19, which injuries ultimately resulted in massive hemorrhage six weeks later on July 7th, there would have undoubtedly been symptoms such as bleeding or cramps commencing at least before her visit on June 5, 1959, a routine visit having to do with her pregnancy, at which time he found Plaintiff to be normal.
Plaintiff is required to prove by a preponderance of evidence injuries sustained by her caused by the negligence of Defendant’s assured. This she has failed to do.
For the reasons assigned, the judgment of the Trial Court dismissing Plaintiff’s suit is affirmed.
Affirmed.